IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

PRONSCHINSKE TRUST DATED MARCH 21, 1995,

                      Plaintiff,

v.

KAW VALLEY COMPANIES, INC. AND
KC PROPPANTS, LLC,

                      Defendants.

OPINION AND ORDER

16-cv-640-slc

This is business contract lawsuit removed to federal court pursuant to diversity jurisdiction. Land owned by Ivan and Beverly Pronschinske contains frac sand, which is useful to gas and oil fracking operations.[1] Through their trust, the Pronschinskes entered into a 2012 Mining Lease Agreement (the Lease) with defendant Kaw Valley Companies, so that Kaw Valley could mine the sand. Ultimately, Kaw Valley walked away without removing any sand, which the Lease allowed it to do. Even so, plaintiff claims that defendants owe it $400,000 because Kaw Valley's activities on the property constituted the "commencement of mine and quarry" operations that triggered defendants' payment obligations under the Lease.

Defendants respond that they owe nothing: under the Lease's plain terms, these payments were not triggered until materials actually had been mined or quarried from the property, and that never happened.

Both sides assert that the Lease's terms are unambiguous so that the court can decide this lawsuit by an analysis limited to the four corners of the document. I agree that the Lease is not ambiguous. Its terms favor defendants. Accordingly, I am granting defendants' motion for summary judgment.

---

[1] "Fracking," is a hydraulic fracturing process used to extract natural gas and oil from hard rock.

The facts are not in dispute:

FACTS

On June 28, 2012, Ivan Pronschinske and Beverly Pronschinske, as trustees of the Pronschinske Trust, entered into a Mining Lease Agreement (the Lease) with Kaw Valley.[2] The Lease gave Kaw Valley the exclusive right to "quarry, process, crush, manufacture, wash, remove and sell ('mine' or 'quarry') all sand, gravel, stone and other rock products" from plaintiff's property in Trempealeau County, Wisconsin, under specified terms and conditions. Mining Lease Agreement, dkt. 26-2, ¶1. The Lease subsequently was assigned from Kaw Valley to KC Proppants in an Assignment of Lease dated February 26, 2015. The term of the Lease was for five years, unless otherwise terminated under the Lease, *id.*, ¶2. The Lease announces that it contains "the entire agreement between the parties." ¶28.

The Lease created three sequential payment obligations for defendants: (1) a $20,000 "Initial Royalty Credit," payable upon execution of the Lease, and which was to be "used to offset any future amounts and royalties due Lessor from Lessee," *id.*, ¶3; (2) a $45,000 "Commencement Royalty Credit," *id.*, ¶5; and (3) "Production Royalties," including a $75,000 "Minimum Production Royalty." *Id.*, ¶6. Kaw Valley paid the $20,000 Initial Royalty Credit

---

[2] The Pronschinske Trust, dated March 21, 1995, is a trust created in the state of Wisconsin with an Arcadia, Wisconsin address. At the times relevant to this lawsuit, Ivan and Beverly Pronschinske were its trustees. Defendant Kaw Valley Companies, Inc. is a Kansas corporation with its principal place of business located in Kansas City. Defendant KC Proppants, LLC is a Kansas limited liability company with its principal place of business in Kansas, but it is no longer in operation. KC has two members, Benjamin Kates and Patrick Scherzer, both of whom are residents of Kansas. Diversity jurisdiction is present.

2

upon execution of the lease.  The issue in this suit is whether defendant owes the Commencement Royalty Credit or the Minimum Production Royalty.

Paragraph 5 of the Lease establishes the "Commencement Royalty Credit":

> Upon Lessee's commencement of mine or quarry operations as determined by Lessee in its reasonable discretion, Lessee agrees to pay to Lessor the sum of Forty Five Thousand Dollars ($45,000.00) (the "Commencement Royalty Credit").  The Commencement Royalty Credit shall be nonrefundable, but shall be used to offset any future amounts and royalties due Lessor from Lessee.

The phrase "mine or quarry" is defined in paragraph 1 of the Lease to mean "to quarry, process, crush, manufacture, wash, remove and sell . . . all sand, gravel, stone and other rock products[.]"

Paragraph 6 of the Lease provides for the payment of weight-based royalties once Products are "mined from the Property;" these royalties are referred to as "Production Royalties."  Paragraph 6 reads, in full:

> Lessee shall pay Lessor a royalty of $1.50/ton (2,000 lbs.) for the first 65,000 ton of sand, stone and rock products mined from the Property in satisfaction of the offset requirements for the Initial Royalty Credit and Commencement Royalty Credit.  Thereafter Lessee shall pay Lessor a royalty of $2.50/ton (2,000 lbs.) for sand, stone and rock products mined from the Property (all such royalties are hereinafter referred to as "Production Royalties") for the sand, stone and rock products mined from the Property weekly (measured from the Effective Date).  Lessee shall make such payments to Lessor no later than the Friday following the week in which products are mined from the Property.  Notwithstanding anything to the contrary contained herein, Lessee shall pay to Lessor an annual minimum Production Royalty of $75,000 (the "Minimum Production Royalty").  In the event that, as of the month containing the anniversary date of the Effective Date, the monthly Production Royalties (as such may be prorated) fail to meet or exceed the Minimum Production Royalty, Lessee shall pay to Lessor the difference between the actual amount paid to Lessor during the year and the Minimum Production Royalty for such

3

year. This catch-up payment will be made with the next monthly payment due hereunder.

Paragraph 9 states, in part:

> The royalties payable under paragraph 6 and paragraph 7 shall be payable based on the removal from (or transportation across) the Property. All sand, gravel, stone and other rock products mined from the Property shall be weighed at the time of removal from the Property and the royalties shall be based on the actual weight as reflected in weight tickets.

The Trempealeau County Department of Land Management ("DLM") grants permits to mining operators that imposes pre-conditions and operational conditions on any mining operations in the county. Pre-conditions must be met prior to beginning mining operations. After executing the Lease, Kaw Valley took a number of steps in preparation to mine or quarry the property. Specifically, these steps consisted of: 1) surveying the property; 2) conducting well checks; 3) taking soil borings; 4) entering into an agreement to pay for an upgrade of County Highway N; and 5) paying for the widening of the road that accesses the property. Defendants spent at least $750,000, primarily on engineering, preparing to operate the mine.

The Lease makes clear that defendants are "not obligated to extract any materials or sell any products by virtue of [the] Lease," (*see* ¶1), that it is in defendants' "reasonable discretion" when and whether to "commence[] . . . mine or quarry operations," (*see* ¶5), and that the Lease is "predicated on the Property being properly zoned for the contemplated quarry operations and immediately and continually available for Lessee's contemplated use." (*See* ¶14).

Paragraph 14 further provides:

> Should Lessee be prevented from conducting its anticipated normal business operations because of a lack of zoning, access, or any necessary governmental permit or approval, or because of any other condition (including without limitation, depletion or

4

> inadequacy of reserves) which in Lessee's opinion renders or threatens to render Lessee's contemplated operations commercially infeasible or impracticable, then (A) Lessee shall have the right, but not the obligation, to undertake such efforts as it deems reasonable and necessary, in its sole discretion, to secure necessary zoning classification, permit, approval, or access, or to remove any such condition, and Lessor agrees to cooperate fully with Lessee in this regard, including but not limited to, execution of any documents and attendance of any hearings which Lessee reasonably deems necessary, or (B) with or without exercise of Lessee's rights under clause (A), Lessee shall be entitled to cancel this Lease, as to all or any portion of the Property, upon ten (10) days' prior written notice to Lessor.

Kaw Valley submitted a Conditional Use Permit ("CUP") application to the Department of Land Management dated October 28, 2012, and the DLM issued "Conditional Use Permit Conditions" on or around January 9, 2013. On February 4, 2015, the DLM granted Kaw Valley's CUP Application. However, defendants determined that it was commercially infeasible or impracticable to engage in mining activities on the Property. Defendants sent a letter to plaintiff dated January 27, 2016, terminating the Lease. On February 5, 2016, the CUP lapsed after the DLM determined that Kaw Valley had "not met or complied with [their] submitted plan for activity requirements, as no activity has taken place at the site."

OPINION

Plaintiff does not dispute that defendants' termination of the Lease was proper. It contends, however, that defendants owe it the $75,000 per year Minimum Production Royalty for the three years after the Lease was executed as well as the two years after cancellation, plus the $45,000 Commencement Royalty Credit (less the $20,000 Initial Royalty Credit that defendants already paid). Defendants contend that they do not owe any Commencement

5

Royalty or the Minimum Production Royalty because they never commenced mining operations and never extracted any products from the property.

Contract interpretation seeks to give effect to the parties' intentions. *Tufail v. Midwest Hospitality, LLC*, 2013 WI 62, ¶ 25, 348 Wis.2d 631, 833 N.W.2d 586. If the terms of a contract are plain and unambiguous, then it is the court's duty to construe the contract according to its plain meaning even though a party may have construed it differently. *Woodward Commc'ns, Inc. v. Schockley Commc'ns Corp.*, 2001 WI App 30, ¶ 9, 240 Wis.2d 492, 498, 622 N.W.2d 756, 759-760. The court must construe the contract language consistent with "what a reasonable person would understand the words to mean under the circumstances." *Seitzinger v. Community Health Network*, 2004 WI 28, ¶ 22, 270 Wis.2d 1, 676 N.W.2d 426.

I. The Commencement Royalty Credit

Paragraph 5 of the Lease establishes the Commencement Royalty Credit. It states:

> Upon Lessee's commencement of mine or quarry operations as determined by Lessee in its reasonable discretion, Lessee agrees to pay to Lessor the sum of Forty Five Thousand Dollars ($45,000.00) (the "Commencement Royalty Credit"). The Commencement Royalty Credit shall be nonrefundable, but shall be used to offset any future amounts and royalties due Lessor from Lessee.

The parties dispute the meaning of the phrase "mine or quarry operations." Defendants argue that the term keys off of the definition of "mine" or "quarry" as defined in Paragraph 1. Paragraph 1 specifies that "mine" or "quarry" means to "quarry, process, crush, manufacture, wash, remove and sell . . . all sand, gravel stone and other rock products . . .". Lease, ¶1. According to defendants, until any of these activities occurred, there were no "mine or quarry

6

operations" on the property. It is undisputed that defendants never engaged in any of these activities on the property.

Plaintiff argues that accepting defendants' view would render the term "operations" meaningless. In plaintiff's view, adding the word "operations" after "mine or quarry" broadens the scope of activities covered by the definition in paragraph 1. Specifically, argues plaintiff, the term includes the steps taken by defendants to secure a CUP and to *prepare* to mine or quarry. In support of this argument, plaintiff has selected Merriam-Webster's sixth definition of the word "operations:" "a usually military action, mission, or maneuver *including its planning and execution.*" Br. in Opp., dkt. 39, at 12 (citing *Merriam-Webster Online Dictionary*, 2017, https://www.merriam-webster.com/dictionary/operation (June 9, 2017) ("Operation," definition 6)(emphasis added).

Plaintiff's contention that "mine or quarry operations" includes actions necessary to secure a CUP and assess the feasibility of operating a mine in advance of any actual mining or quarrying strains the actual terms of the Lease beyond their plain and ordinary meaning. If plaintiff's definition is correct, then which action by defendants would *not* be deemed to be a part of the planning stage for mining or quarrying? Everything the parties said and did was part of the plan to undertake mining or quarrying on plaintiff's land. Yet ¶¶ 1, 5 & 14 of the Lease, quoted above, elucidate a sequence of events that clearly anticipates that mining or quarrying operations will commence on some future date, but only if certain conditions are met and only if defendants *choose* to commence, which they are not obliged to do.

To reach its favored definition of "operation," plaintiff leapfrogs over Merriam-Webster's first and second definitions of the word, namely: "performance of a practical work or something

involving the practical application of principles or processes," followed by: "2 a) an exertion of power or influence . . . b) the quality or state of being functional or operative . . . c) a method or manner of functioning." *Id. See also Operation*, New Oxford American Dictionary (2d ed. 2005) ("the fact or condition of functioning or being active" or "an active process; a discharge of a function"); *Operation*, Dictionary.com, http://dictionary.com/browse/operation (last visited Aug. 9, 2017) (1. "an act or instance, process, or manner of functioning or operating").

Consistent with the primary definition of "operation," ordinary people reading paragraph 5 of the Lease would understand the phrase "commencement of mine or quarry operations" to mean when the mine or quarry became active by actually mining or quarrying sand. Ordinary people would not understand the phrase to encompass preparatory activity that occurred before mining or quarrying began.

This is all the more evident when the reader considers that "the meaning of particular provisions in the contract is to be ascertained with reference to the contract as a whole." *Tempelis v. Aetna Cas. & Sur. Co.*, 169 Wis.2d 1, 9, 485 N.W.2d 217 (1992). The term "operation" or "operations" is used in several other paragraphs in the Lease, including:

- Paragraph 2, providing that Lease will continue beyond its original 5-year term so long as Lessee "continuously conducts mining or quarrying *operations* at the Property;"

- Paragraph 10, providing that "Lessee's *operations* shall be conducted in a workmanlike manner with as little waste of sand, stone and rock products as practicable;"

- Paragraph 12, providing that Lessee will indemnify Lessor against liabilities arising "out of Lessee's use, occupancy or *operations* on the Property under the terms of this Lease in pursuit of its mining *operations* at the Property;"

8

- Paragraph 14, providing that the Lease is predicated on the property being properly zoned for the contemplated "quarry *operation*" and that Lessee had the right to terminate the Lease because of conditions that render "Lessee's contemplated *operations*" commercially or practically infeasible; and

- Paragraph 26, providing that "Lessee shall conduct its mining *operations*" in compliance with recognized practices and procedures in the mining industry and applicable laws.

In short, when the Lease is read as a whole, it is obvious that the term "operations" contemplates actual mining or quarrying activities as opposed to pre-operation activities such as engineering, surveying and taking soil samples. In particular, Paragraph 14 explains that defendants were under no obligation to establish a mine or quarry on the property if they were unable to obtain the necessary permits or if any other condition rendered the contemplated mine commercially infeasible or impracticable. Clearly, plaintiff understood that defendants would be undertaking activities on the property to secure those permits and to assess the commercial feasibility of a mine. It is reasonable to conclude that if the parties had intended for such activities to have triggered the Commencement Royalty, then they would have said so in specific terms. Put another way, it is *not* reasonable or plausible to conclude that the word "operations" after the term "mine or quarry" in paragraph 5 evidences an intent to broaden the term "mine or quarry" to encompass steps taken before any mining or quarrying actually occurred. Giving the contract a plain and ordinary reading, it is clear that the Commencement Royalty did not become due until defendants actually commenced "mining" or "quarrying" as those terms are defined in paragraph 1. Because these activities never occurred, plaintiff cannot recover on this claim.

9

II. <u>Minimum Production Royalty</u>

Paragraph 6 of the Lease, set forth above, provides for the payment of weight-based royalties—referred to as "Production Royalties"—once Products are "mined from the Property." It specifies a dollar amount per ton of sand, stone and rock products that defendants are to pay plaintiff. Paragraph 6 also provides that, "[n]otwithstanding anything to the contrary contained herein, Lessee shall pay to Lessor an annual minimum Production Royalty of $75,000 (the 'Minimum Production Royalty')," with any shortfalls between the monthly Production Royalties and Minimum Production Royalty to be made up on an annual basis.

Seizing on Paragraph 6's "Notwithstanding" clause, plaintiff argues that the annual Minimum Production Royalty was triggered regardless whether any products ever were mined from the property. This argument is untenable. As defendants point out, the entirety of Paragraph 6 relates exclusively to the payment of Production Royalties; the $75,000 payment itself is described as a Minimum Production *Royalty*. Giving Paragraph 6 an ordinary and plain reading, it is clear that the Minimum Production Royalty, like the Production Royalties, is not owed until products are "mined from the property." The "notwithstanding" clause makes clear that once mining began, if Production Royalties were low, then defendants nevertheless were obliged to pony up a floor of $75,000 in yearly royalty payments. The clear purpose of this clause is to protect plaintiff from unanticipated slowdowns in production after mining operations began.

Further, if the parties truly had contemplated a lease that guaranteed plaintiff an annual payment of $75,000 regardless whether any products were mined from the property, they could have just said so. As defendants point out, if this were the case, then it would have been more

logical for the parties to have included a stand-alone paragraph that required defendants to pay plaintiff at least $75,000 a year upon execution of the Lease. It would make no sense to insert a dependent clause introducing the fourth sentence in a paragraph devoted exclusively to payment of Production Royalties.

Once again, plaintiff's interpretation of the Lease is contrary to its plain and unambiguous terms. Accordingly, its claim that it is owed Minimum Production Royalties in the amount of $75,000 per year for five years is rejected. Defendants are entitled to summary judgment on this claim.

ORDER

IT IS ORDERED that defendants' motion for summary judgment, dkt. 25, is GRANTED. The clerk of court is ordered to enter judgment for defendants and close this case.

Entered this 15th day of August, 2017.

BY THE COURT:

/s/

STEPHEN L. CROCKER
Magistrate Judge